Slip Op. 20-124

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STEEL AND FASTENERS, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Gary S. Katzmann, Judge |
| Defendant, | Court No. 15-00113 |
| and | |
| SHAKEPROOF ASSEMBLY COMPONENTS DIVISION OF ILLINOIS TOOL WORKS INC., | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[The court denies Plaintiff's motion and affirms Commerce's Final Results.]

Dated: August 26, 2020

<u>Dharmendra Choudhary</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of Washington, DC, argued for plaintiff.  With him on the brief and supplemental brief were <u>Francis J. Sailer</u>, <u>Mark E. Pardo</u>, <u>Brandon M. Petelin, and Ned H. Marshak</u>.

<u>Eric J. Singley</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Claudia Burke</u>, Assistant Director, <u>Renee Gerber</u> and on the supplemental brief was <u>Joseph H. Hunt</u>, Assistant Attorney General.  Of Counsel were <u>W. Mitch Purdy</u> and <u>Nanda Srikantaiah</u>, Attorney-International, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

<u>Raymond P. Paretzky</u> and <u>David J. Levine</u>, McDermott, Will & Emery, LLC, of Washington, DC, for defendant-intervenor.

Katzmann, Judge: This case involves a challenge to the U.S. Department of Commerce's ("Commerce") selection of surrogate values to determine antidumping ("AD") duties for exports from a non-market economy ("NME").   Plaintiff United Steel and Fasteners, Inc. ("US&F") challenges Commerce's decision to use Thai Harmonized Tariff Schedule ("HTS") 7228.20 as a surrogate value for the primary input -- hot-rolled circular silico-manganese steel bar ("Bar") -- into the helical spring lock washers ("HSLWs"), which were the subject of Commerce's AD review.  See Helical Spring Lock Washers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013, 80 Fed. Reg. 13,833, 13,833 (Dep't Commerce Mar. 17, 2015), P.R. 126, ECF No. 81 ("Final Results"); Mem. from C. Marsh to R. Lorentzen, re: Issues and Decision Mem. for the Final Results of Antidumping Duty Administrative Review: Helical Spring Lock Washers from the People's Republic of China; 2012–2013 at 4–8 (Dep't Commerce Mar. 9, 2015), P.R. 121, ECF No. 81 ("IDM"); Pl.'s Suppl. Br. Pursuant to the Ct.'s Order of Apr. 20, 2020 at 1, 17, May 18, 2020, ECF No. 79 ("Pl.'s Suppl. Br.").   US&F specifically claims Commerce's choice of surrogate value was unsupported by substantial evidence and otherwise not in accordance with the law because the value chosen did not represent the "best available information," as 19 U.S.C. § 1677b(c)(1) (2012)[1] requires.  Pl.'s Suppl. Br. at 1, 7.  The court sustains Commerce's use of the surrogate value in its Final Results and denies US&F's Rule 56.2 motion.  See Pl.'s Mot. for J. on the Agency R. at 17–35, Nov. 13, 2015, ECF No. 24 ("Pl.'s Br.").

---

[1] Unless otherwise indicated, all citations to statutes are to the 2012 edition of the United States Code, and all references to regulations are to the 2012 edition of the Code of Federal Regulations.

## BACKGROUND

### I.    *Legal and Regulatory Framework for Surrogate Value Selections*

The Tariff Act of 1930 empowers Commerce to investigate and impose remedial duties on imported products that are being dumped -- sold at less than a "fair value" or a lower price than in the home market.  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012).   In addition to other statutes and regulations, the Act creates a framework for determining whether a product is being dumped in the United States, determining the extent to which it is being dumped, and calculating the AD duty to offset the dumping.  See id. at 1047.  A domestic producer or other interested party that believes a foreign company is dumping products in the United States may request that Commerce initiate an administrative review.  19 U.S.C. § 1673a(b)(1); 19 C.F.R. § 351.213(b); see, e.g., N. M. Garlic Growers Coal. v. United States, 953 F.3d 1358, 1362 (Fed. Cir. 2020).

In an antidumping investigation and any subsequent review of an order, Commerce determines whether the export prices of the subject merchandise are lower than the "normal value" of the same merchandise when it is sold in the exporting country.  19 U.S.C. § 1677b(a)(1)(B)(i). If the exporting country is an NME that provides insufficient information to determine the normal value, Commerce may use surrogate values from market economy countries for "the factors of production utilized in producing the merchandise and . . . for general expenses and profit plus the cost of containers, coverings, and other expenses."   19 U.S.C. § 1677b(c)(1).   Section 1677b(c)(3)(A)–(D) lists the factors of production as including, but not limited to: (A) labor hours required; (B) quantities of raw materials used; (C) energy and other utilities consumed in production; and (D) capital costs and depreciation.  Commerce thus uses these market economy

surrogates for actual production costs to calculate a surrogate value -- used in place of a home-market value -- for comparison to the export price.

Section 1677b(c)(1) requires that Commerce value the factors of production "based on the best available information regarding the values of such factors in a market economy country."  In determining which data are the best available, Commerce has "broad discretion" because "best available information" is not defined by statute.  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citing Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999)); see also Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994).  However, Commerce's discretion to select surrogate values is "curtailed by the purpose of the statute, i.e., to construct the product's normal value as it would have been if the NME country were a market country."  Rhodia, Inc. v. United States, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001) (citing Nation Ford Chem. Co., 166 F.3d at 1375).  As with all of its decisions in AD reviews, Commerce must establish AD margins as accurately as possible.  Shakeproof Assembly Components Div. of Ill. Tool Works v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

In choosing "one or more market economy countries" to provide surrogate factor values, 19 U.S.C. § 1677b(c)(4) requires that Commerce "utilize, to the extent possible" costs of factors of production from market economy countries that are "at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise."  Although Commerce "normally will value all factors in a single surrogate country," 19 C.F.R. § 351.408(c)(2), Commerce may also "mix and match" surrogate country values with values available in the exporting NME country if the NME values are more accurate, Lasko Metal Prods. v. United States, 16 CIT 1079, 1082, 810 F. Supp. 314, 317 (1992), aff'd, 43 F.3d 1442 (Fed. Cir. 1994).  If more than one market economy country meets the requirements to provide

surrogate values, Commerce may choose a primary surrogate country based on whether the factor of production ("FOP") data are (1) publicly available; (2) contemporaneous with the period of review ("POR"); (3) a broad market average covering a range of prices; (4) from an approved surrogate country; (5) specific to the input in question; and (6) tax exclusive.  See Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004), available at: http://enforcement.trade.gov/policy/bull04-1.html (last accessed Aug. 13, 2020) ("Policy Bulletin 04.1");  see also, e.g., Jiaxing Bro. Fastener Co. v. United States, 822 F.3d 1289, 1302 (Fed. Cir. 2016) (finding "no error in Commerce's . . . preference to appraise surrogate values from a single surrogate country" with statistics that were "specific, contemporaneous, and represented broad market averages").

Upon review of Commerce's choice of certain surrogate values as the best available information, the court will not determine whether the data used were actually the best available, but "whether a reasonable mind could conclude that Commerce chose the best available information."  Jiaxing Bro. Fastener, 822 F.3d at 1301 (citing Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011)); see also Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted).

## II.    *Factual and Procedural History of the Antidumping Order and Surrogate Value Selection*

In 1993, Commerce issued an AD order on HSLW from the People's Republic of China ("PRC").  Antidumping Duty Order: Certain Helical Spring Lock Washers from the People's Republic of China, 58 Fed. Reg. 53,914 (Dep't Commerce Oct. 19, 1993); see also Amended Final Determination and Amended Antidumping Duty Order: Certain Helical Spring Lock Washers from the People's Republic of China, 58 Fed. Reg. 61,859 (Dep't Commerce Nov. 23, 1993).  On December 3, 2013, Commerce initiated the administrative review of this AD order for the period

between October 1, 2012, and September 30, 2013, in response to petitions from US&F and

Defendant-Intervenor Shakeproof Assembly Components Division of Illinois Tool Works, Inc.

("Shakeproof").  See Initiation of Antidumping and Countervailing Duty Administrative Reviews

and Request for Revocation in Part, 78 Fed. Reg. 72,630 (Dep't Commerce Dec. 3, 2013).

Because the investigated companies' home market is the PRC, an NME, Commerce

undertook an analysis of an appropriate surrogate country for calculating normal value.  Mem.

from S. Balbontin to The File, re: Prelim. Results of the Eighteenth Administrative Review of

Helical Spring Lock Washers from the People's Republic of China: Surrogate Value Memorandum

at 2 (Dep't Commerce Oct. 31, 2014), P.R. 8, ECF No. 33.  US&F and Shakeproof provided

comments on the appropriate surrogate.  Id.  US&F claimed that record evidence supported using

Indonesia as the surrogate country because it had the most specific data for hot-rolled circular

silico-manganese steel bar, the primary input into HSLWs.  Letter from US&F to P. Pritzker, re:

US&F's Surrogate Country Comments: Administrative Review of the Antidumping Order on

Helical Spring Lock Washers from the People's Republic of China at 2 (July 25, 2014), P.R. 2,

ECF No. 31 ("US&F Surrogate Country Comments").  Shakeproof argued Thailand was the most

appropriate surrogate for the administrative review because of the availability of data.  Letter from

Shakeproof to Sec'y of Commerce re: Certain HSLWs from China; 20th Administrative Review

Rebuttal Comments on Surrogate Country Selection at 2 (Aug. 4, 2014), P.R. 75, ECF No. 81.

Commerce published its Preliminary Results on November 7, 2014, in which it

preliminarily chose Thailand as the primary surrogate country because of (1) available industry-

specific labor data; (2) publicly available freight costs; and (3) available and contemporaneous

financial statements for financial ratios required for the normal value calculation.  See Helical

Spring Lock Washers from the People's Republic of China: Preliminary Results of Antidumping

Duty Administrative Review; 2012–2013, 79 Fed. Reg. 66,356, 66,357 (Dep't Commerce Nov. 7,

2014) ("Preliminary Results"); Mem. from C. Marsh to R. Lorentzen, re: Decision Mem. for

Prelim. Results of Antidumping Duty Administrative Review: Helical Spring Lock Washers from

the People's Republic of China; 2012–2013 at 10 (Dep't Commerce Oct. 31, 2014), P.R. 105, ECF

No. 81 ("PDM").  At issue here, Commerce valued Bar -- the main input of subject merchandise

HSLW and thus an important factor in calculating surrogate value -- based on the average unit

value ("AUV") of imports under Thai HTS 7228.20 ("Other Bars and Rods of Silico-Manganese

Steel").  Id. at 11.  Commerce explained that it chose Thai HTS 7228.20 to value Bar as a FOP

because of its practice to use values from a single surrogate country.  Id.  Commerce rejected

US&F's proposal of Indonesia as its primary surrogate country and Indonesian HTS 7228.20.1100

because Commerce did not have "useable surrogate financial statements" from Indonesia, while it

did from Thailand.  Id.  Therefore, Commerce explained that its practice dictated using values from

Thailand.  Id.  Commerce further rejected Thai HTS 7228.20.1100 because there were no imports

under that heading contemporaneous with the POR.  Id.

          In its subsequent administrative case brief, US&F argued Commerce did not use the best

available data in selecting Thai HTS 7228.20 to value Bar because both Thai HTS 7228.20.1000

and Indonesian HTS 7228.20.1100 were more specific to Bar and thus would be more accurate.

See IDM at 4–5.  It argued that Thai HTS 7228.20.11000 provided data, despite being one month

before the POR, that are more specific to the actual inputs of HSLWs.  Id.  It claimed that the

Indonesian HTS 7228.20.1100 data are also more specific, in addition to being contemporaneous

with the POR.  Id.  Shakeproof also noted that the data for Thai HTS 7228.20 used by Commerce

in its Preliminary Results did not entirely match the POR, but ultimately agreed that Commerce's

selection was "proper and consistent with settled agency and judicial precedent."  Id. at 4–5.

On March 17, 2015, Commerce published its <u>Final Results</u>.  Due to ministerial error, Commerce then amended those <u>Final Results</u>.  <u>Helical Spring Lock Washers from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012–2013</u>, 80 Fed. Reg. 21,208, 21,209 (Apr. 17, 2015).  In the accompanying IDM, Commerce stated that Thailand remained the primary surrogate country because (1) Thailand had the same level of economic development as the PRC; (2) it produces significant quantities of HSLWs; and (3) of the availability of the data noted in the PDM.  IDM at 4.  Commerce accordingly continued to use Thai HTS 7228.20 import data as a surrogate value for Bar.  <u>Id.</u> at 8.  Commerce revised the data it used to only include data from the POR, <u>id.</u>, as Shakeproof recommended in its case brief.  In response to US&F's case brief, Commerce stated that the "best available information" standard does not require specificity with respect to HTS codes reflecting the actual inputs of HSLWs to override Commerce's preference for "(1) contemporaneity with the [period of review ("POR")] over specificity or, (2) using a single country in valuing the factors."  <u>Id.</u> at 6.  Commerce further explained that the factors for choosing surrogate values are weighed on a case-by-case basis and that there is no hierarchy among the factors.  <u>Id.</u>

On May 14, 2015, US&F filed a complaint to challenge Commerce's <u>Final Results</u> as not supported by substantial evidence and not in accordance with law with respect to four issues. Compl. at 4–6, ECF No. 8.  After initial submission of briefs and oral argument, the case was re-assigned to this Chambers. Ct. Order, Feb. 2, 2019, ECF No. 68.  The court then granted a motion to stay the case pending final decision in a separate appeal to the Federal Circuit in <u>United Steel and Fasteners, Inc. v. United States</u>, Fed. Cir. No. 17-2168.  Ct. Order, May 2, 2019, ECF No. 71. After the Federal Circuit ruled on that appeal, US&F decided not to pursue several issues in this case that it had raised initially.  Only one issue remains before the court: whether Commerce's

decision to use Thai HTS 7228.20 as a surrogate value was supported by substantial evidence and

otherwise in accordance with law.  Suppl. Joint Status Report, Apr. 17, 2020, ECF No. 76.  US&F

and the Government each filed a supplemental brief on April 18, 2020.  See Pl.'s Suppl. Br.; Def.'s

Suppl. Br. Filed Pursuant to the Ct.'s Order of Apr. 20, 2020, May 18, 2020, ECF No. 78 ("Def.'s

Suppl. Br.").  Oral argument was held on July 28, 2020.  ECF No. 85.  On July 31, 2020, US&F

filed a post-argument second supplemental brief.  Pl.'s Second Suppl. Br. Pursuant to the Ct.'s

Order of July 28, 2020, ECF 86.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).  Section 1516a(b)(1)(B)(i) states the standard of review in AD duty

proceedings: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by

Commerce that is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."

## DISCUSSION

US&F asks the court to remand the issue of selection of a surrogate value for Bar to

Commerce.  Pl.'s Suppl. Br. at 17.  The Government responds that Commerce's selection of Thai

HTS 7228.20 was supported by substantial evidence.  Def.'s Suppl. Br. at 3.  The court declines

to substitute its judgment for that of Commerce.  Because the court holds that Commerce's

selection of Thai HTS 7228.20 as a surrogate value was supported by substantial evidence and in

accordance with law, the court sustains Commerce's Final Results.

Commerce enjoys broad discretion in its interpretation of what is the best information

available.  QVD Food, 658 F.3d at 1323.  Nevertheless, US&F argues that Commerce's selection

of Thai HTS 7228.20 data as a surrogate value for Bar inputs was not supported by substantial

evidence nor in accordance with law because it was not based on the best available information.

Pl.'s Suppl. Br. at 1.  Its claims before the court are similar to its claims that preceded Commerce's

Final Results, namely that the "best available information" standard requires: (1) surrogate values

that have a rational and reasonable relationship to the FOP; (2) that surrogate data choices should

be made, in part, based on whether the data come from an approved surrogate country, and not

necessarily the primary surrogate country; (3) that product specificity is the most important

criterion; (4) that contemporaneity should be of lesser weight when choosing surrogate values; and

(5)  that Commerce "should weigh the relative superiority of one [data] set on any given criteria

with its relative inferiority on another criteria" and choose "a superior data choice available from

a secondary surrogate country over inferior data from the primary surrogate country."  Pl.'s Suppl.

Br. at 7–9.  Hence, US&F maintains the Indonesian HTS 7228.20.1100 data set, or, alternatively,

Thai HTS 7228.20.11000 presents the best available information.  Id. at 9.  The court is not

persuaded by these arguments because Commerce, within its discretion, made a reasonable

selection that was supported by substantial evidence and in accordance with law.

Notably, the parties dispute the applicable standard for the requisite specificity of surrogate

values and its relationship to other factors that Commerce evaluates in choosing surrogate values.

US&F argues that "[t]he most important criteria" for determining which is the best available data

set "is product specificity."  Pl.'s Suppl. Br at 8 (citing Taian Ziyang Food Co. v. United States,

35 CIT 863, 907, 783 F. Supp. 2d 1292, 1330 (2011)).[2]  US&F further claims that "[d]ata which

---

[2] In its latest brief, US&F argues Soc Trang Seafood supports its argument that Commerce should use more specific data.  Pl.'s Suppl. Br. at 11 (quoting Soc Trang Seafood Joint Stock Co. v. United States, 43 CIT __, __, 365 F. Supp. 3d 1287, 1290, 1292 (2019)).  In Soc Trang Seafood, the court affirmed Commerce's decision to use data from a secondary surrogate country because they were more specific and contemporaneous despite its "regulatory preference [] to 'value all factors in a single surrogate country.'"  365 F. Supp. 3d 1287 at 1291–92 (quoting 19 C.F.R. § 351.408(c)(2) (2015)).  In that case, the primary surrogate country lacked data that were both contemporaneous

are not product-specific cannot be used as surrogate values, even if the remaining criteria arguably favor selection of that data." Id.  US&F claims that this is true even where the data for the more specific product heading are less reliable than the data for the broader heading.  See Pl.'s Suppl. Br. at 13.  The Government responds that US&F misreads the caselaw.  Def.'s Suppl. Br. at 8.  The Government contends that the cases instead indicate that Commerce may, within its discretion, choose either a basket header or a more specific sub-header -- so long as the header chosen is sufficiently product-specific and its selection is supported in light of the other factors considered under Policy Bulletin 04.1 -- because those factors are not hierarchical.  Def.'s Suppl. Br. at 11. See also PDM at 10 ("There is no hierarchy among these criteria.  It is [Commerce's] practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs.").  The court agrees with the Government.  See also An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 40 CIT __, __, 179 F. Supp. 3d 1256, 1269 n.19 (2016) ("The court did not hold that product specificity is the most important consideration in selecting a [surrogate value] data source . . ."); Xiamen Int'l Trade & Indus. v. United States, 38 CIT __, __, 36 ITRD 868 (2014) (noting that Commerce does not value specificity above all other considerations, but that it is one, important consideration).

---

and specific, while here, Commerce chose to use primary surrogate data that were contemporaneous with the period of review ("POR") and sufficiently specific.  See id. at 1292; IDM at 8.  This case, like the other cases cited by US&F in its briefs, is inapposite because they each merely affirm Commerce's exercise of discretion in choosing the surrogate country, and do not hold that Commerce may not make a surrogate country selection based on lack of specificity. See, e.g., Pl.'s Suppl. Br. at 12–13 (citing Fine Furniture (Shanghai) Ltd. v. United States, 42 CIT __, __, 353 F. Supp. 3d 1323, 1346 (2018); Vulcan Threaded Prods. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1357, 1362 (2018); Elkay Mfg. Co. v. United States, 40 CIT __, __, 180 F. Supp. 3d 1245, 1253 (2016), aff'd, sub nom. Guangdong Dongyuan Kitchenware Indus. Co. v. Elkay Mfg. Co., 702 F. App'x 981 (Fed. Cir. 2017)).

The relevant question is whether substantial evidence on the record supports that Thai HTS 7228.20 is sufficiently product-specific to the FOP at issue to allow a comparison with other criteria, and not whether Thai HTS 7228.20 is the most specific product specific heading available. See Taian Ziyang Food, 783 F. Supp. 2d at 1330.  Whether the surrogate value has sufficient specificity to the material input to allow comparison with other criteria -- including contemporaneity -- requires that substantial evidence shows the surrogate data are not so removed from the material input such that they are not comparable (between fishing rods and cardboard packing cartons, for example).  See id. at 1314.  In fact, the court in Fine Furniture stated that "it is unlikely that Commerce established [] a hierarchy between contemporaneity and specificity" and that Commerce's choice of the primary surrogate country based in part on contemporaneous, rather than specific, data was reasonable.  Fine Furniture (Shanghai) Ltd. v. United States, 42 CIT __, __, 353 F. Supp. 3d 1323, 1342 (2018).

Because Commerce's selection of Thai HTS 7228.20 was sufficiently specific and supported by other relevant considerations, the court concludes that this selection was supported by substantial evidence.

### A.  Sufficient Specificity of Thai HTS 7228.20 To Allow Comparison of Other Criteria

In selecting Thai HTS 7228.20, Commerce stated that it provided data that were sufficiently specific, contemporaneous to the POR, publicly available, representative of a broad-market average, tax exclusive, and that allowed it to use a single surrogate country.  IDM at 6. US&F first contends that Thai HTS 7228.20 is overbroad because it is not sufficiently specific to the input factor at issue, Bar.  Pl.'s Suppl. Br. at 9.  The Government responds that US&F failed to meet its burden of showing that data from Thailand were not the best available information because it did not place or point to any evidence on the record to indicate that Thai HTS 7228.20

produced a distorted surrogate value.  Def.'s Suppl. Br. at 13.  US&F raises that generally cold-pressed steel bar and non-circular characteristics make steel bar more expensive than steel bar that is circular or hot-rolled.  Pl.'s Suppl. Br. at 4–5.  Because of this, it contends that Thai HTS 7228.20 includes products that increase the surrogate value in a manner that does not reflect the true value of the hot-rolled, circular steel bar.  Id.  US&F claims that the "hot rolled steel bar is less expensive than cold rolled steel bar" and that "[s]ince the most common form of steel bar has a circular profile, its average prices are comparatively lower."  Pl.'s Suppl. Br. at 4–5.  For this claim, it cites a single case in which Commerce found that "the surrogate value of hot-rolled steel is less than that for cold-rolled steel" in that specific instance.  Pl.'s Suppl. Br. at 4 (quoting Foshan Shunde Yongjian Housewares & Hardware Co. v. United States, 35 CIT 1398, 1405, 33 ITRD 2123 (2011) (analyzing the ratio of hot-rolled to cold-rolled steel used as material inputs in the manufacture of the respondent's products)).  US&F fails to provide a citation or data for its claim regarding the difference in price between circular and non-circular steel bar in the context at issue and only claims the relative prices differ on average.  See Pl.'s Suppl. Br.at 4–5.

More importantly, US&F failed to place information on the record before Commerce showing that the inclusion of cold-rolled and non-circular steel bar imports in Thai HTS 7228.20 distorted the data Commerce used in this case from an estimate of the value of the actual hot-rolled, circular material input.  See US&F Surrogate Country Comments; US&F Case Brief; cf. Taian Ziyang Food, 783 F. Supp. 2d at 1314.  As Commerce noted in its IDM, "there is no record evidence, in this review, that [] the AUVs of Thai HTS 7228.20 are not reasonably comparable nor has US&F argued so."  IDM at 8.  Furthermore, the crux of US&F's argument is that "[t]he most important criteria is product-specificity" and not that Thai HTS 7228.20 is insufficiently specific to allow any comparison at all with Commerce's other criteria.  Pl.'s Suppl. Br. at 8; see

<u>also</u> Def.'s Suppl. Br. at 11.  There is therefore limited evidence on the record, other than the fact

that cold-rolling and non-circular shapes generally make steel bar expensive, to detract from

Commerce's determination in its IDM that Thai HTS 7228.20 was sufficiently specific to then

weigh it against other factors.  <u>See</u> IDM at 8.

Thus, substantial evidence supports that Thai HTS 7228.20 data are sufficiently specific

for Commerce to weigh their specificity against other relevant factors in choosing that sub-

heading.  First, there is a rational relationship between Thai HTS 7228.20 -- which covers "Bars

And Rods of Silico-Manganese Steel" -- and the material input of Bar because the former includes

the latter by definition.  <u>See</u> <u>Xiamen Int'l Trade</u>, 36 ITRD 868.  This is not a situation where

Commerce used fishing rods as surrogate for cardboard packing boxes, as was the case in <u>Taian</u>

<u>Ziyang Food</u>.  783 F. Supp. 2d at 1330.  Similarly, Commerce's decision here does not rise to the

level of insufficiency of the selection in <u>Zhejiang DunAn Hetian Metal</u>, where Commerce used

import data that may have related to entirely different metals than the relevant FOP.  652 F.3d at

1341 (summarizing plaintiff's argument that Commerce used data that were not for brass bar when

the relevant FOP was for brass bar, but ultimately concluding that the record did not establish that

data were products made of other metals).  The Government and Defendant-Intervenor refer to

several cases in which Commerce's use of broader import categories for surrogate values has been

sustained.[3]  From these cases, it follows that there is no principle requiring Commerce to select

---

[3] <u>See</u> Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. at 20–21, Apr. 14,
2016, ECF No. 32 (citing <u>Guangdong Chems. Imp. & Exp. Corp. v. United States</u>, 30 CIT 1412,
1419, 460 F. Supp. 2d 1365, 1371 (2006) ("The use of broader product categories is reasonable,
despite the availability of product-specific data, if a greater variety of data provides greater
reliability."); <u>Writing Instrument Mfrs. Ass'n, Pencil Section v. Dep't of Commerce</u>, 21 CIT 1185,
1196, 984 F. Supp. 629, 640 (1997) (upholding the use of a broader tariff category where the other
data on the record were unreliable)); <u>see also</u> Resp. Br. of Def.-Inter. in Opp'n to Pl.;s Mot. for J.
upon the Agency R. at 23, Apr. 14, 2016, ECF No. 30 (citing <u>Goldlink Indus. Co. v. United States</u>,
30 CIT 616, 630–33, 431 F. Supp. 2d 1323, 1335–38 (2006) (upholding Department's valuation

the most specific HTS category.  Rather, Commerce has discretion to select a reasonable surrogate in light of each of the criteria outlined in Policy Bulletin 04.1.

In sum, the court holds that Commerce's finding -- that Thai HTS 7228.20 was sufficiently specific -- was "reasonable and supported by the record as a whole, even if there is some evidence that detracts from" it.  See Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001).  Substantial evidence on the record supports that Thai HTS 7228.20 was sufficiently specific to weigh other factors because (1) the "burden of creating an adequate record lies with [interested parties] and not with Commerce," QVD Food, 658 F.3d at 1324 (alteration in original); and (2) the record fails to reflect how inclusion of cold-rolled, non-circular steel bar distorts the surrogate data in this case such that the surrogate data are not sufficiently specific.  The court will therefore next consider whether Commerce's weighing of specificity against its other criteria and rejection of Thai HTS 7228.20.11000 and Indonesian HTS 7228.20.1100 were supported by substantial evidence.

### B. Commerce's Selection of Thai HTS 7228.20 over Indonesian HTS 7228.20.1100

US&F argues that Commerce should have chosen Indonesian HTS 7228.20.1100, as it is more specific than Thai HTS 7228.20 and includes data contemporaneous with the POR.  Pl.'s Suppl. Br. at 14.  First, US&F argues that Indonesian HTS 7228.20.1100 provided better data than Thai HTS 7228.20 because (1) Indonesia was an approved surrogate country; (2) the Indonesian

---

of input carbazole "using a basket category import price rather than a more specific import price" when the more specific price was less reliable on account of other deficiencies")).  Cf. Home Meridian Int'l Inc. v. United States, 772 F.3d 1289, 1295 (Fed. Cir. 2014) (upholding Commerce's use of a broader category surrogate value than a respondent's market economy purchases because it was, in part, more contemporaneous with the POR and more reflective of actual prices paid for the inputs); Dorbest Ltd. v. United States, 30 CIT 1671, 1701–02, 462 F. Supp. 2d 1262, 1289–90 (2006) (sustaining Commerce's use of a data set that included merchandise other than that being valued)).

data were more specific to the FOP than Thai HTS 7228.20; and (3) the Indonesian data were contemporaneous to the POR.  Pl.'s Suppl. Br. at 14.  Thus, US&F argues Commerce was required to use Indonesian HTS 7228.20.1100 as the best available information for a surrogate value of hot-rolled, circular bar instead of Thai HTS 7228.20 because, all else being equal, the data are more specific.

US&F provides no additional reasons why Commerce must have chosen the Indonesian header over Thai HTS 7228.20.  Commerce explained in both its PDM and its IDM that it has a "well established" preference for using values from a single surrogate country and that Thailand had the best available information for all of the FOPs after weighing of all the relevant factors.  PDM at 11; IDM at 6.  Commerce applied its preference for valuing all surrogate data from one country in tandem with a broader assessment of all relevant factors, and reasonably selected the Thai data as its primary surrogate over Indonesian data.  PDM at 11.  The court thus concludes that Commerce's selection of Thai HTS 7228.20 over Indonesian HTS 7228.20.1100 for valuing Bar and its explanation for this choice were reasonable and within its discretion and regulatory preference for valuing all the factors from a single country.  See QVD Food, 658 F.3d at 1323.

US&F claims that caselaw and Commerce's own practice prohibits Commerce from relying on its policy of using a single surrogate country as the sole grounds to prefer one choice of surrogate value over another.  See Pl.'s Suppl. Br. at 14; Pl.'s Br. at 33–35.  The issues in the cases US&F provides are factually distinct, however, and do not indicate that Commerce's determination in this case was unreasonable.  For example, US&F argues that Camau Frozen Seafood dictates that where data from the primary surrogate country are distorted or inaccurate, Commerce may not rely solely on its preference for valuing all surrogate data in the primary surrogate country, even without an interested party necessarily establishing that the data are aberrational.  Pl.'s Br. at 33–

34 (quoting Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, 37 CIT 1116,

1123, 929 F. Supp. 2d 1352, 1358 (2013)).   US&F's reliance on Camau Frozen Seafood is

unpersuasive, however, because the court there determined that data used by Commerce based on

a preference for primary surrogate country data were "several orders of magnitude larger" than

other available data.  929 F. Supp. 2d at 1355.  As discussed above, the record evidence does not

support that the data used by Commerce here were similarly distortive.  The same reasoning applies

to US&F's reliance on Peer Bearing Co.-Changshan v. United States, 35 CIT 1626, 804 F. Supp.

2d 1337 (2011), and Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final

Results of Antidumping Duty New Shipper Reviews; 2011-2012, 78 Fed. Reg. 39,708, 39,708

(Dep't Commerce July 2, 2013).  See Pl.'s Br. at 34–35.

      In sum, because the cases US&F cites are distinct from this case and because "[c]ourts

have found that Commerce's single surrogate country preference is strong and must be given

significant weight," the court finds Commerce's use of Thai HTS 7228.20 was reasonable.  Jacobi

Carbons AB v. United States, 38 CIT __, __, 992 F. Supp. 2d 1360, 1376 (2014), aff'd, 619 F.

App'x 992 (Fed. Cir. 2015).  Therefore, the court finds Commerce's decision to choose Thai HTS

7228.20 over Indonesian HTS 7228.20.1100 was supported by substantial evidence and in

accordance with law.

### C.  Commerce's Selection of Thai HTS 7228.20 Over Thai HTS 7228.20.1100

      Next, US&F argues that Commerce should have chosen the more specific sub-heading of

Thai HTS 7228.20.1100 even though the data from that sub-heading were not contemporaneous

with the POR.  Pl.'s Suppl. Br. at 15.  The Government responds that, unlike Thai HTS

7228.20.1100, Thai HTS 7228.20 fulfilled all of the surrogate value criteria and thus Commerce

was not required to use Thai HTS 7228.20.1100.  Def.'s Suppl. Br. at 9.  The court agrees with the

Government.

Commerce noted that the import data for Thai HTS 7228.20.11000 occurred one month

prior to the POR and explained its preference here for contemporaneous data rather than the most

specific data with regards to choosing Thai HTS 7228.20.  IDM at 6.  Commerce's desire to favor

data that were contemporaneous with the POR was reasonable in light of the fact that it "weighed

all of the factors [Commerce] normally examines when choosing a" surrogate value and the fact

that the Thai HTS 7228.20.11000 data "offer[] a only [sic] single shipment . . . from a single

country."  IDM at 5–6.  Moreover, Commerce's correction after the Preliminary Results to use

only Thai 7228.20 data that were contemporaneous with the POR further supports Commerce's

reasoned preference for contemporaneous data in this case.  IDM at 8.  The court thus concludes

that Commerce's selection of data from Thai HTS 7228.20 over Thai HTS 7228.20.1100 and its

explanation for doing so were reasonable and within Commerce's broad discretion in determining

which data are the best available.  QVD Food, 658 F.3d at 1323.

US&F's position fails to acknowledge that Commerce's discretion to determine which data

are the best available in its AD reviews includes how to weigh the individual factors when choosing

the best available data, provided it offers a reasonable explanation when exercising such discretion.

Hangzhou Spring Washer Co. v. United States, 29 CIT 657, 672, 387 F. Supp. 2d 1236, 1250

(2005).  The court "does not decide . . . whether contemporaneity should be valued over specificity

without direct statutory instruction because a reviewing court is prohibited from substituting its

judgment for that of the agency."  Id. at 1250–51.  The court in Fine Furniture stated that "it is

unlikely that Commerce established [] a hierarchy between contemporaneity and specificity" and

that Commerce's choice of a primary surrogate country based in part on contemporaneous, rather

than specific, data is reasonable.  353 F. Supp. 3d at 1346.  Moreover, even where a heading is not

perfectly specific to the material input, in cases where that data's contemporaneity allows it to

better reflect actual prices of inputs, it is "not unreasonable for Commerce to find the [data] more

reliable." <u>Home Meridian Int'l, Inc. v. United States</u>, 772 F.3d 1289, 1296 (Fed. Cir. 2014).  This

may be especially true where, as here, the more specific data offer limited volume, "bringing into

question the reliability of" that data.  <u>See</u> <u>Writing Instrument Mfrs. Ass'n, Pencil Section v. Dep't

of Commerce</u>, 21 CIT 1185, 1195, 984 F. Supp. 629, 639 (1997).

 The cases US&F offers as support for its position are distinguishable.  For example, US&F

cites <u>Zhejiang DunAn Hetian Metal</u> for the proposition that use of an HTS heading that "include[s]

materials that [are] not representative of the inputs utilized by the manufacturer . . . <u>might</u> well

conflict with Commerce's obligation to use the best available evidence . . . ."  652 F.3d 1333, 1343

(Fed. Cir. 2011) (emphasis added).  In <u>Zhejiang DunAn Hetian Metal</u>, however, Commerce

included import data that may have related to entirely different metals than the relevant FOP.  <u>Id.</u>

at 1341 (questioning whether Commerce used data that were not from brass bar when the relevant

FOP was brass bar).  Here, Commerce used a heading that only includes imports for steel bar, even

though that heading includes steel bar with different heat treatments and shapes.  Pl.'s Suppl. Br.

at 4.  US&F's reliance on <u>Vinh Hoan Corp. v. United States</u> is also distinguishable because there

the Federal Circuit upheld Commerce's decision to reject certain data in the in the context of HTS

code specificity and FOP value comparisons.  786 F. App'x 258, 265 (Fed. Cir. 2019).  Unlike this

case, the court did not consider a decision by Commerce that weighed contemporaneity against

specificity -- or weighed specificity against any factor for that matter -- in the process of selecting

"the 'best available information' for the factors of production."  <u>Id.</u> at 261.

Therefore, the court concludes that Commerce properly exercised its discretion in selecting Thai HTS 7228.20 over the non-contemporaneous and less voluminous data of Thai HTS 7228.20.1100.

## CONCLUSION

The court holds that Commerce's use of data from Thai HTS 7228.20 for a surrogate value instead of Thai HTS 7228.20.11000 or Indonesian HTS 7228.20.1100 was supported by substantial evidence on the record and in accordance with law.  Thus, the court affirms the <u>Final Results</u> as to this selection.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  August 26, 2020
          New York, New York